**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ISIX IP LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2:23-CV-00237-JRG |
| | § | |
| SAP AMERICA, INC., | § | |
| | § | |
| Defendant. | § | |

**CLAIM CONSTRUCTION ORDER**

In this patent case, Isix IP LLC alleges infringement by SAP America, Inc., of claims from U.S. Patent 6,308,178. The patent relates to a software system for migrating data between different software applications without the need to write specialized code. *See* '178 Patent at 1:7–11.

The parties dispute whether the phrase "a first module including a plurality of instruction sets" invokes 35 U.S.C. § 112 ¶ 6 and, if it does, whether the patent discloses sufficient corresponding structure to avoid an indefiniteness challenge by SAP. Having considered the parties' briefing and arguments of counsel during a September 24, 2024 hearing, the Court holds the phrase is not a means-plus-function term.

## I. BACKGROUND

Enterprise Application Integration (EAI) software "integrate[s] various business software applications employed by the diverse operating sectors of a single business organization (for example, financial operations, human resources, shipping and receiving, etc.), or by such operating sectors of multiple organizations." '178 Patent at 1:14–19. Problematically, however, "various software applications maintain data according to different data models, such as hierarchical

networks, relational models, spreadsheets, multimedia databases, knowledge databases and other types of data models." *Id.* at 1:26–29. This gives rise to a need to synchronize data between the various applications. *See id.* at 1:29–32.

There are generally two ways of doing this. First, the "custom integration method" uses a traditional software development model in which someone writes custom code to operate with the various applications, but this is time-consuming and labor-intensive. *See* '178 Patent at 1:56–2:8. Alternatively, a company can buy off-the-shelf integration packages that query the various source applications for the desired data. But that approach still requires some custom code. *See id.* at 2:9–23.

The '178 Patent teaches "a flexible, end-to-end integration solution that manages all mapping, validation, and synchronization of data among heterogeneous source and destination applications." '178 Patent at [57]. The solution uses "add-on modules or cartridges," each of which includes "predefined instruction sets defining chains of data elements to perform interface functions corresponding to a particular destination application." *Id.* "The underlying interface communication and processing functions are performed by an active component (or engine) according to the configuration data and the module instruction sets." *Id.*

The parties dispute the scope of one phrase from Claim 1, which recites:

> 1. A system for integrating data among heterogeneous source applications and destination applications, comprising:
>
> a repository of information relating to the source applications and the destination applications, the repository including a plurality of data elements each being capable of performing a discrete operation on a piece of data, and *a first module including a plurality of instruction sets*, each instruction of each instruction set activating a data element; and

> an active component connected to the repository having an input for loading data from the source applications, and an output for populating the destination applications with processed data, the active component processing the data from the source applications by activating data elements according to the plurality of instruction sets in the module.

'178 Patent at 9:51–67 (emphasis added). Specifically, the parties dispute whether "a first module including a plurality of instruction sets" invokes 35 U.S.C. § 112 ¶ 6 and, if it does, whether the patent discloses corresponding structure to avoid an indefiniteness holding.[1]

## II. LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

---

[1] The United States District Court for the Western District of Texas previously concluded "module" is not subject to § 112 ¶ 6 and should be given a "plain and ordinary meaning" construction. *See* Cl. Constr. Order, Dkt. No. 42-3 at 3.

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Means-Plus-Function Claiming

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112 ¶ 6 (pre-AIA); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Under 35 U.S.C. § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function," and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

But § 112 ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means" or "step for" terms, and a rebuttable presumption it does *not* apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. These presumptions stand or fall according to whether one of ordinary skill in the art would understand the claim with the functional language to denote sufficiently definite structure or acts for performing the function in the context of the entire specification. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (noting § 112 ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Masco Corp.*, 303 F.3d at 1326 (noting § 112 ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim

uses the term 'means.'" (quotation marks and citation omitted)).

Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "The next step is to determine the corresponding structure described in the specification and equivalents thereof." *Id.*

"Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"[S]tructure can be recited in various ways, including [by using] 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (quoting *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2005)). For § 112, ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must usually include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In that case, the corresponding structure is not a general-purpose computer but rather the special-purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### C. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 908.

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). And in the context of § 112 ¶ 6, "[t]he party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party offers a proposed level of ordinary skill in its briefing. Isix's expert, however, opines a skilled artisan at the time of invention "would have had an undergraduate degree in computer science or a similar field and 2 years of experience working in a computer science

[field].” Grabert Decl., Dkt. No. 42-2 ¶ 31. Because that is the only level of skill found in the record and SAP does not contest it, the Court adopts that characterization for the purpose of resolving the present dispute.

## IV. THE DISPUTED TERM

### “a first module including a plurality of instruction sets” (’178 Patent, Claim 1)

| Isix’s Construction | SAP’s Construction |
|---|---|
| This term is not indefinite under §112, ¶ 6 and is used according to its plain and ordinary meaning. No further construction is necessary. | “module” is a nonce term subject to §112, ¶ 6.<br>**Function:** “including a plurality of instruction sets”<br>**Structure:** Indefinite. |

SAP asserts this is a means-plus-function term without any corresponding structure, so the term is indefinite. It stresses “module” is a well-known nonce term, and notes Isix’s list of possible “structure” shows this is simply a generic term that does not connote anything specific. Dkt. No. 43 at 3–4 (citing Dkt. No. 42 at 11). It concludes the function of the term is “storing” the plurality of instruction sets, and notes the patent fails to disclose any algorithm for doing so under *Williamson*. *Id.* at 5.

Isix starts with the presumption that this is not a means-plus-function term because the claim does not use the word “means.” Dkt. No. 42 at 6. Moreover, says Isix, there is no recited function, as the claim simply limits the structure of the module to include “a plurality of instruction sets,” each of which “activate[s] a data element.” *Id.* at 7. Isix also notes the patent repeatedly describes the module as a “cartridge” or a “pre-built integration package,” which avoids any invocation of § 112 ¶ 6. *Id.* at 5.

This is not a means-plus-function term. To start, the phrase does not use the word “means,” nor does it recite a “function” in the form traditionally found in means-plus-function limitations.

Although SAP argues the function is "including," that is merely an alternative form of "comprising" or "having," and a skilled artisan would not understand "including" in this phrase as anything other than describing what makes up the module structurally. Accordingly, the presumption that this phrase is not governed by § 112 ¶ 6 applies.

Moreover, the Court disagrees with SAP's assertion that the patent "uses the term 'module' [as] 'simply a generic description for software or hardware that performs a specified function.'" Dkt. No. 43 at 4. SAP points to Isix's assertion that the "module" could be any of a "cartridge," "a prebuilt integration package," a "software add-on," "metadata," or a "purchase order Oracle Application." *Id.* But other than "metadata,"[2] the Court is not persuaded these are referring to different things, and the parties have not argued that point in either the briefing or at the hearing.

For example, the patent often equates "module" with "cartridge." *See, e.g.*, '178 Patent at [57] (describing the invention generally as having "a plurality of add-on modules or cartridges which each include a plurality of predefined instruction sets"); *id.* at 2:44–47 (explaining "[t]he functionality of the system is expandable through use of modules (or cartridges) that may be added to the repository as the organization's integration requirements expand"). Elsewhere, the patent describes the module as "pre-built." *See id.* at 5:54–56 (noting "the user may select from a variety of available modules pre-built to permit interface with one of the plurality of business applications"). And the patent's reference to "a purchase order Oracle Application module" is simply an exemplary embodiment of a "module" as otherwise described in the written description. *See id.* at 5:8–13 (noting "[e]ach module 70 includes a list of predefined tables that are configured to work

[2] The patent's reference to "metadata" relates to "configuration data storage 80 containing configuration data" rather than "plug-in modules 70." *See id.* at 4:27–31.

with the relevant destination application 14 that will receive the inputs," and then describing "a purchase order Oracle Application module" as an example).

The patent defines what it means by "module"—"software add-ons configured to operate with [an] active component . . . to add increased functionality to [a] system." '178 Patent at 4:22–24. The claim language itself then further limits the nature of the "first module" to instruction sets that activate data elements. *See id.* at 9:59–60. And although the parties don't dispute the substantive differences, if any, between "cartridge," "pre-built integration package," and "software add-on," the terms seem to be at least closely related, if not the same things.

Ultimately, SAP has not shown this is a means-plus-function term.[3] On this record, "module" is not a nonce term, and the disputed phrase does not recite a function so much as limit what makes up the module. Accordingly, based on the definition provided by the patent, the Court construes "module" as "a software add-on configured to operate with an active component to add increased functionality to the system."

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "a first module including a plurality of instruction sets"<br>('178 Patent, Claim 1) | **"module":** "a software add-on configured to operate with an active component to add increased functionality to the system" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the

[3] Even if the Court were to hold this is a means-plus-function term, it would not hold the term is indefinite for failing to disclose an algorithm as required by *Williamson*. Nothing in the intrinsic record suggests any recited "function" is being performed by a general purpose processor.

parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 10th day of October, 2024.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE